THE NEWARK SAVINGS INSTITUTION

*v.*

DAVID JONES'S EXECUTORS.

Where an agreement for the sale of lands does not mention the character of the title to be given, an implication ordinarily arises that the title to be conveyed is to be a good one, free from encumbrances. But such implication may be rebutted by parol proof of the vendee's notice of the existence of encumbrances on the lands at the time of the agreement.

Bill for specific performance. On final hearing on pleadings and proofs.

*Mr. G. W. Hubbell,* for complainant.

*Mr. Jos. Cross,* for defendants.

THE CHANCELLOR.

This suit is brought to compel specific performance of an agreement in writing made by and between the complainant and

David Jones, now deceased, on the 30th day of January, 1877, for the purchase by Jones from the savings bank, the complainant, and the sale by it to him, of certain land and premises in Newark, for the sum of $20,000. The bank, previously to the before-mentioned day, obtained a decree for foreclosure and sale of the property (which consisted of several tracts) to raise and pay to it the sum of $24,196.04, with interest and its costs of suit. On one of the tracts, but only on one, Jones had a subsequent mortgage. He was a party to the suit and proved his claim therein. There was a decree in his favor thereon for the sum of $20,775.67. On the day of the sale of the property under the execution, and previously to the sale, the agreement in question was entered into. It was as follows:

"Newark Savings Institution v. C. Wiedenmayer. In chancery. *Fi. fa.* &c.

"I hereby agree to buy the property advertised under above execution, after the same shall have been bought by the complainants, and to pay them for the same the sum of twenty thousand dollars; the savings bank besides to pay the taxed costs.

"DAVID JONES.

"We hereby agree to sell the same as above to David Jones.
"NEWARK SAVINGS INSTITUTION.
"DANIEL DODD, *President.*"

The property was purchased at the sale on that day by the bank. Jones refused to take it unless the bank would pay the taxes and municipal assessments to which it was subject, and which amounted to a large sum. The answer of Jones (he is now dead, and his executors, to whom by his will he gave all his estate in trust, have been substituted and have appeared in his place) raises several objections to the complainant's claim. The principal ones are as follows: That the president of the bank had no authority to make the agreement on its behalf; that the agreement was the result of an unlawful bargain that Jones should not bid on the property at the sheriff's sale, but should permit the bank to buy it, and that he would afterwards buy it of the bank at the price of $20,000; that the bank refused to pay the taxes and assessments, and therefore could not make a

clear title; that it was guilty of laches in not tendering itself ready to make the conveyance within a reasonable time, and that the deed which it tendered did not contain a covenant of warranty.

The main question discussed and presented for consideration is whether, under the contract, the defendants are entitled to a title clear of the encumbrance of the taxes and assessments. There can be no question from the evidence that Mr. Dodd, the president of the bank, was fully authorized and empowered to make and enter into the contract on its behalf. The making of the contract is admitted. It is urged on behalf of the defendants that from the terms of the agreement there arises a legal implication that the title to be conveyed is to be a good one, and therefore clear of encumbrance, and that the testimony offered on the part of the bank to show that it was understood between the parties when the agreement was made that the property was to be taken by Jones subject to the taxes and assessments, is incompetent. But the agreement is silent as to the character of the title to be given, and while in such case, in the absence of proof to the contrary, the implication arises that the title to be conveyed is to be a good one and therefore free from encumbrance, that implication may be rebutted. Notice is sufficient to rebut the mere implication, and parol proof is, on this ground, admissible. *Fry on Spec. Perf.* *101; *Pom. on Cont.* §§ *157, 346; Ogilvie* v. *Foljambe, 3 Meriv. 52; Cowley* v. *Watts, 17 Jur. 172; James* v. *Lichfield, L. R. (9 Eq.) 51.* The evidence is therefore competent to show notice and rebut the implication. That the subject of the liability of the property to the payment of past-due taxes and assessments was considered by the parties to the agreement is apparent from the testimony on both sides, and apart from that evidence it is a matter which obviously would, under the circumstances, naturally have entered into their consideration. The persons who conducted the negotiation were men of business. The transaction involved large interests. The president of the bank was a resident of Newark and a lawyer by profession. Mr. Jones was a man of very large business, living in the city of New York, and was attended by his counsel, Mr.

Whitehead, an experienced practicing lawyer of Newark. They could not have overlooked or failed to take into their consideration in their negotiations so important an element. We are not, however, left to mere conjecture or the discussion of probabilities. Mr. Dodd swears with the utmost positiveness and distinctness that in the negotiations which immediately preceded and resulted in the agreement, it was well understood by both parties that there was a considerable amount due for unpaid taxes and assessments on the property, and that it was finally expressly agreed that Jones should pay the bank $20,000 for the property and pay those taxes and assessments himself. His testimony on the subject is as follows:

"The complainant had held, for several years, bonds of the Wiedenmayers for the sum of $20,000, secured by mortgages upon various pieces of property in the city of Newark, including the property in question; the defendant (Jones) held a mortgage, subsequent to ours, upon the same or a portion of the same premises; the interest upon our bonds was in arrears and unpaid for several years prior to the sale; during those years, prior to the sale, I had many interviews with Mr. Whitehead, representing Mr. Jones, upon the subject, we having commenced a foreclosure of the mortgage; various propositions had been made for the settlement of our conflicting interests, and the sale of the property to Mr. Jones, it being plainly supposed by both parties that the property mortgaged was worth considerably more than the amount of our encumbrance; a considerable amount was also due and unpaid for taxes and assessments on the property, which was well understood by both parties; we finally proposed to accept, for our interest in the property, the amount of the principal sum due, and to throw away the interest; Mr. Whitehead, in behalf of Mr. Jones, offered us a less amount than that, which we positively declined to accept, and he finally offered to pay the sum of $20,000, provided out of it we would pay the taxes and assessments; this we declined to do; we had several interviews, prior to the sale, with the same result; one of those interviews was held on the morning of the sale, or on the day before, I think; this was clearly and definitely understood by both parties that the point in difference between us was who should pay the taxes and assessments; on the day of the sale Mr. Whitehead said to me that Mr. Jones had consented to take the property and pay us the sum of $20,000, and pay the taxes and assessments himself; that proposal was made at the last moment, and, in consequence, I hurriedly drew the contract, which was signed by myself and Mr. Jones, as before mentioned; the understanding was clear and explicit, and, I supposed, left no room for misunderstanding; when the sale was finished we had some conversation as to whether the sheriff's deed should be made to Mr. Jones or

to us, and by us to him ; we offered and urged that the thing should be done at once, and in either way that would be agreeable to him."

On cross-examination, he says :

" If he [referring to Mr. Jones, and the interview of the morning] offered lower sums than $20 000, I scouted his offer as ridiculous and absolutely refused to accept anything less than the $20,000; the proposition which I finally accepted was made at the court-house; there was nothing else in the shape of a negotiation between us except the refusal or acceptance of my offer ; the only question was whether he would accept my offer, and Mr. Whitehead told me at the court-house that he would ; I think I never had more than one interview with Mr. Jones, without we had two on the day of sale ; Mr. Whitehead, prior to the interview with Mr. Jones, made me an offer for the property ; I cannot say when it was any more definitely than I have already done ; he frequently offered the $20,000 if we would pay the taxes and assessments ; I think he once offered $15,000, and subsequently increased his offer to $18,000, but I am not definite about that, but our funding committee had examined the property carefully, piece by piece, and had authorized me to accept $20,000 net for our interest in it, and hence I paid but little attention to any other proposition but that."

He further says, on cross-examination, that the existence of Mr. Jones was not more definitely understood at the time of the sale than was the fact that the bank was to have the $20,000, and he, Jones, to pay the taxes and assessments ; that it had been the subject of constant talk during all their negotiations ; that he well remembers that when he drew the agreement, it stopped at the word " dollars," and then the subject of costs was mentioned, and Mr. Whitehead said the bank must pay the taxed costs, and he objected, but after consulting with Mr. Hubbell, the bank's solicitor (who was present), agreed to do so, and added the words " the savings bank, besides, to pay the taxed costs."

While Mr. Whitehead expressly and explicitly denies that he told Mr. Dodd, on the day of sale, that Mr. Jones consented to take the property and pay $20,000 for it, and pay the taxes and assessments himself, and says that Mr. Jones did not make such an offer on the day of sale, and testifies also that the proposal that Jones would take the property on those terms was not

made at the court-house, and that the subject of taxes and assessments was not discussed there, his memory is probably not to be fully relied upon, for he says, in the outset of his testimony, that he will give his testimony in a very unsatisfactory manner to himself, because his recollection about some parts of the case is exceedingly indefinite, while he will remember positively other parts of it. He says that his recollection about the taxes and assessments is, that there was nothing said about them at the time of the interview on the morning of the day of the sale, nor at the time of sale, when the agreement was signed, but adds that he will not be positive about it. He further says that, on reflection, he is inclined to think that the negotiation was not completed at the bank, but was taken up again at the court-house and finally completed there. He had previously testified to a different impression, viz., that it was agreed, in the interview at the savings bank in the morning, that Jones would buy the property from the bank, and give $20,000 for it. He does not remember whether the offer made by Mr. Jones at the bank on the morning of the day of sale, was not to pay $20,000 if the bank would pay the taxes and assessments out of the money, nor whether the bank did not decline that offer; nor does he remember whether the point of difference between the parties at that time was not as to who should pay the taxes and assessments; but he says he thinks it was not. He also says that he does not say definitely that the taxes and assessments were not talked of during the bargain, but does say that he has not the slightest recollection of their being mentioned at the interview of the morning of the day of sale, or at the sale. He adds that it is possible that they might have been mentioned, but he has not the slightest recollection of it. He says that in the interview of the morning Mr. Jones made an offer of $15,000 for the decree, which, according to his recollection, Mr. Jones increased to $18,000, and that in reply Mr. Dodd said he was authorized by the finance committee to accept not less than $20,000. He further says that it is his impression that at that interview the negotiation was confined to the sale of the bank's claim under the decree. He says he declined to take an assignment of the decree, but is not positive

whether he declined to Mr. Dodd, but thinks he did.   He says
he advised Mr. Jones decidedly not to take an assignment of the
decree, and that he advised him not to take a deed directly from
the sheriff, because, if he did, he would take it subject to the
payment of taxes and assessments; whereas if he took it from
the bank, he would have them responsible to him for the taxes
and assessments.

It is very clear that the subject of the taxes and assessments
was present to the minds of both parties in the negotiations. As
before stated, Mr. Dodd swears with the greatest positiveness that
it was the subject of express negotiation. Turning from the con-
trarieties of this testimony to the contract itself for evidence of
the true character of the bargain, that instrument is found to
contain cogent proof.   It provides for the payment of the taxed
costs of the foreclosure suit by the bank.   Why, if the agree-
ment was as the defendants claim, a mere contract on the part of
Jones to buy the property clear of all encumbrances, for the
price of $20,000, Mr. Whitehead should (as Mr. Dodd swears
he did) have required the insertion in the instrument of a pro-
vision that the bank should pay those costs, it is impossible to
conjecture.   Mr. Jones was not liable for them in any way, and
of course his purchase of the property from the bank would not
make him so.   If the agreement was that the bank should have
$20,000 for its decree, and it was part of the agreement that for
reasons of Mr. Jones's own the property should be bought in at
the sheriff's sale by the bank, some question might have arisen
as to whether the bargain was not that the bank was to have
from him the $20,000 for its mortgage debt alone, and its taxed
costs besides.   Unless that was the reason it is impossible to con-
ceive of any for requiring the insertion of the stipulation. Taken
in connection with the fact that in the interview which took
place in the morning, Mr. Jones offered $18,000 for the decree,
and Mr. Dodd refused to take less than $20,000, and that the
negotiations were resumed at the sale, this provision for the pay-
ment of costs makes it quite clear that Mr. Jones was to take
the property and pay the bank $20,000 for its interest therein.
Mr. Whitehead says that Mr. Dodd, in the interview in the

morning, refused Mr. Jones's offers, and finally " offered to take $20,000 for the decree." . He also says that if no arrangement was made in the morning, it was so [fully] understood that about all that was necessary was to draw the agreement; that his recollection is, that there was not a word said about taxes at the sheriff's office, but the thing was all done in the shortest possible time in which such a thing could be accomplished; that they had discussed the matter at the bank in the morning, and each party understood the other's views; that Mr. Dodd had mentioned the smallest amount he would take, and the matter was left for Mr. Jones to accept; that his recollection is that when they got to the sheriff's office (he says this is a recollection upon reflection made since the taking of the testimony commenced) all that was done was simply for him to say to Mr. Dodd " Mr. Jones will give you $20,000 for the property; you buy it at the sale and make a deed to Mr. Jones from the savings institution," and then Mr. Dodd drew the contract, handed it to him, he read it and handed it to Mr. Jones, and that it was all done in a very short space of time—that there was just about time enough taken to do it. From this statement itself it would seem clear that the purchase was understood to be substantially the purchase of the bank's decree. The negotiation in the morning was for that interest, and it resulted in no agreement, but Mr. Dodd stated as a finality that he would take $20,000 for it. According to Mr. Whitehead's recollection, nothing was done at the sale but to accept Mr. Dodd's terms. That would have been to agree to pay $20,000 for the bank's interest in the property. Mr. Dodd positively and unequivocally swears, as before stated, that Mr. Jones expressly agreed to take the property at $20,000 and pay the taxes and assessments himself. The complainant was not required, under the contract, to warrant the title. *Locander* v. *Lounsbery, 9 C. E. Gr. 417*. It was required to convey the land. And by implication, in the absence of evidence of facts rebutting the implication, was bound to give a good title. But the evidence shows that the bargain was not for a good title but for the interest the bank had in the property.

Nor has the bank been guilty of laches in tendering the deed. The evidence is that immediately after the sale, Mr. Dodd urged that Mr. Jones should take the deed at once, and take it directly from the sheriff. A very few days afterwards he urged Mr. Whitehead to take it for Mr. Jones, his client, and offered compliance on the part of the bank, to which Mr. Whitehead, he says, replied in effect that he would attend to it. He further says that he had several interviews with Mr. Whitehead to the same effect and with the same result, within the next year or two, always urging that Mr. Jones should perform his part of the agreement, and offering performance on the part of the bank. He says he cannot give the precise words of the replies, but their effect and meaning were that Mr. Jones was in a very large and absorbing business, and very difficult to find; that Mr. Whitehead himself saw him but seldom, and that the latter was himself also very busy. He adds that these were the reasons given for the delay, and that there was no intimation whatever as to any misunderstanding in regard to the meaning and effect of the contract. He says he thinks that once Mr. Whitehead, in a jocose vein, said that if the bank would pay the taxes and assessments, he would see that it got the $20,000; but he did not treat the remark as having been made seriously.. In July, 1879, the bank tendered a deed to Mr. Jones in New York and demanded the fulfillment of the contract on his part, but he refused, saying the matter was in the hands of Mr. Whitehead, his attorney, in Newark; and when the agent of the bank replied that it had applied unsuccessfully to Mr. Whitehead for the fulfillment of the contract, Mr. Jones, without giving any reason, absolutely refused to have anything to do with the matter. The bank had previously, from the preceding May, endeavored to find Mr. Jones to make the tender, but was not successful, and before making the tender to Mr. Jones it made the tender to Mr. Whitehead, and he, on behalf of Mr. Jones, refused to comply. The bill was filed in January, 1880. It is clear that the bank, from the time of the sale, was anxious to have the contract fulfilled by Mr. Jones, and was at all times ready to carry it out, and that neither Mr. Whitehead nor Mr. Jones was at any time willing to take the

deed unless the bank would agree to pay the taxes and assessments, which it was not bound to do. The answer avers no special reason, growing out of the delay, why the defendants should not now perform the contract, but merely claims that Jones was discharged from liability to take the property, by the delay. According to the bill, the bank has endeavored to preserve the property and keep it in as good condition as it was able, for the benefit of Jones, and has rented such part of it as it could, and is ready to account for the rents on receiving the purchasemoney. There is no evidence of any unlawful agreement between the parties in reference to the sheriff's sale. No complaint is made of any unfairness, injustice, inequality or unreasonableness in the contract. The question between the parties, in reference to the contract, is as to what the bargain was.

There will be a decree for specific performance of the agreement.